UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - x
                             :

UNITED STATES OF AMERICA            :

            v.                      :     INDICTMENT

GULNARA KARIMOVA and          :     19 Cr.
BEKHZOD AKHMEDOV,

             Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
(Conspiracy to Violate the Foreign Corrupt Practices Act)

The Grand Jury charges:

## OVERVIEW

1.     As detailed further below, between in or about 2001 and in or about 2012, GULNARA KARIMOVA and BEKHZOD AKHMEDOV, the defendants, engaged in an extensive corrupt bribery scheme in which KARIMOVA demanded, and AKHMEDOV and his co-conspirators agreed to pay, hundreds of millions of dollars in bribes to KARIMOVA on behalf of three global telecommunications companies seeking to obtain and retain business in the Republic of Uzbekistan, in violation of the Foreign Corrupt Practices Act ("FCPA") and other foreign bribery laws.  AKHMEDOV, acting as both an executive of one of the telecommunications companies and as a personal representative of KARIMOVA, solicited and facilitated the corrupt bribe payments from the three telecommunications companies and their subsidiaries to shell companies controlled by KARIMOVA, who at the time was an Uzbek government official.  In exchange for the bribes, KARIMOVA corruptly used her influence over the Uzbek government to ensure that the three telecommunications companies and their

1

subsidiaries acquired telecommunications licenses, which, under Uzbek law, could not be purchased or transferred by private entities, and also to allow the telecommunications companies to enter, and continue to operate in, the telecommunications market in Uzbekistan. In total, AKHMEDOV and others conspired to make approximately $866 million in corrupt bribe payments to KARIMOVA. In furtherance of the corrupt bribery scheme, AKHMEDOV and KARIMOVA conspired with others to launder the bribe funds to, from, and through bank accounts in the United States, in order to promote the ongoing bribery scheme and conceal the proceeds of that scheme.

## RELEVANT INDIVIDUALS AND ENTITIES

2.      GULNARA KARIMOVA, the defendant ("KARIMOVA"), was an Uzbek government official and the daughter of the then-President of Uzbekistan. KARIMOVA was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

3.      Mobile TeleSystems PJSC (previously Mobile TeleSystems OJSC) ("MTS") was a multinational telecommunications company headquartered and incorporated in the Russian Federation. MTS maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, *see* Title 15, United States Code, Section 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, *see* Title 15, United States Code, Section 78o(d). Accordingly, MTS was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.      Uzdunrobita was a telecommunications company headquartered and incorporated in Uzbekistan. Uzdunrobita conducted telecommunications business on behalf of, and for the benefit of, MTS in Uzbekistan. In or around 2004, MTS began operating its mobile

telecommunications business in Uzbekistan through its indirect subsidiary Uzdunrobita. Between in or about 2004 and in or about 2012, MTS held between 74% and 100% of Uzdunrobita. MTS acquired its ownership interest in Uzdunrobita, in part, from the purchase of all of the shares held in Uzdunrobita by a company located in the United States (the "American Company"), whose identity is known to the Grand Jury.

5.    BEKHZOD AKHMEDOV, the defendant ("AKHMEDOV"), was the "General Director" of Uzdunrobita from 2002 to 2012. AKHMEDOV directly reported to MTS executives and acted on behalf of, and for the benefit of, MTS. Accordingly, AKHMEDOV was an officer, employee, and agent of an "issuer," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a). Both before and while serving as an executive of Uzdunrobita and an officer, employee, and agent of MTS, AKHMEDOV was also a close associate of KARIMOVA and solicited bribe payments on her behalf in order to benefit KARIMOVA and obtain KARIMOVA's ongoing support for MTS and Uzdunrobita in Uzbekistan.

6.    The Uzbek Agency for Communications and Information ("UzACI") was an Uzbek governmental entity authorized to regulate operations and formulate government policy regarding communications, information technology, and the use of radio spectrum in Uzbekistan. Accordingly, UzACI was a "department," "agency," and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-3(f)(2). KARIMOVA had influence over decisions made by UzACI.

7.    KOLORIT DIZAYN INK LLC ("KOLORIT") was an Uzbek advertising company that was, at times, controlled by KARIMOVA. As detailed further below, in or around

2009, KOLORIT was acquired by MTS and Uzdunrobita as part of the scheme to pay bribes to KARIMOVA.

8.    "Shell Company A," "Shell Company B," and "Shell Company C," whose identities are known to the Grand Jury, were companies beneficially owned by KARIMOVA through which the telecommunications companies paid bribes.

9.    "Associate A," an individual whose identity is known to the Grand Jury, was KARIMOVA's close associate and was the purported sole owner and director of Shell Company A.

10.    "Associate B," an individual whose identity is known to the Grand Jury, was in a romantic relationship with KARIMOVA and was the purported sole owner and director of Shell Company B.

11.    "Associate C," an individual whose identity is known to the Grand Jury, was KARIMOVA's close associate.  When Shell Company C was incorporated in 2004, Associate C was approximately 20 years old and was Shell Company C's purported sole owner and director.

12.    From in or around 2007 to in or around 2013, "MTS Executive 1," an individual whose identity is known to the Grand Jury, was a high-ranking executive at MTS with authority over MTS's foreign subsidiaries.  From in or around 2007 through in or around 2012, AKHMEDOV reported to MTS Executive 1.

13.    Beginning in or about 2010, VimpelCom Ltd., which is now known as VEON, was a multinational telecommunications company headquartered in the Netherlands and incorporated in Bermuda.  From in or about 1996 through in or about 2013, VimpelCom Ltd., or its Russian-based predecessor company PJSC VimpelCom (collectively, "VimpelCom") maintained a class of publicly traded securities registered pursuant to Section 12(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d). Accordingly, VimpelCom was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

14.     In or about 2006, VimpelCom acquired two Uzbek telecommunications companies, Unitel LLC ("Unitel") and LLC Bakrie Uzbekistan Telecom ("Buztel"), and merged the two companies as Unitel. Unitel was headquartered and incorporated in Uzbekistan and conducted telecommunications business on behalf of, and for the benefit of, VimpelCom in Uzbekistan.

15.     From in or about 2002 through in or about January 2014, "VimpelCom Executive 1," an individual whose identity is known to the Grand Jury, worked for various VimpelCom-related entities. From in or about December 2009 through in or about January 2014, VimpelCom Executive 1 was a high-ranking VimpelCom executive with responsibilities in the Commonwealth of Independent States ("CIS") region, including oversight of Unitel in Uzbekistan.

16.     From in or about 2003 through in or about February 2013, "VimpelCom Executive 2," an individual whose identity is known to the Grand Jury, worked for various VimpelCom-related entities. From in or about February 2010 through in or about February 2013, VimpelCom Executive 2 worked with VimpelCom Executive 1 relating to VimpelCom's business in the CIS region, including oversight of Unitel in Uzbekistan.

17.     Beginning in or about 2002, Telia Company AB, formerly TeliaSonera AB (collectively, "Telia"), was a multinational telecommunications company headquartered and incorporated in Sweden. From in or about 2002 through or about September 5, 2007, Telia

maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, Title 15, United States Code, Section 78o(d).  Accordingly, during that time period, Telia was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18.     In or about 2007, Telia began operating its mobile telecommunications business in Uzbekistan through its indirect subsidiary Coscom LLC ("Coscom").  Coscom was headquartered and incorporated in Uzbekistan and conducted business on behalf of, and for the benefit of, Telia in Uzbekistan.

19.     Telia indirectly owned 100% of TeliaSonera UTA Holding B.V. ("Telia UTA"). Beginning in or about December 2007, Telia UTA held between 74% and 94% of TeliaSonera Uzbek Telecom Holding B.V. ("Telia Uzbek").  Telia Uzbek held 99.97% of Coscom, and the remaining 0.03% was held directly by Telia UTA.

20.     "Telia Executive 1," an individual whose identity is known to the Grand Jury, was a high-ranking executive of Telia who had authority over Telia's business in Uzbekistan, among other countries.

## THE BRIBERY AND MONEY LAUNDERING SCHEME

### *The MTS and Uzdunrobita Bribes*

21.     From in or about 2001 through in or about 2012, AKHMEDOV conspired with others to pay more than $420 million in bribes to KARIMOVA in exchange for her taking corrupt action to ensure that MTS could enter, and MTS and Uzdunrobita could continue to operate in, the Uzbek telecommunications market.  AKHMEDOV, MTS Executive 1, and certain other executives and employees of MTS and Uzdunrobita agreed to pay KARIMOVA more than

$420 million in bribes in order to conduct business in Uzbekistan. As described further below, the bribes were funneled by MTS and Uzdunrobita to KARIMOVA in various ways, including through business transactions that were made to appear legitimate on their face. In furtherance of the corrupt scheme, AKHMEDOV and KARIMOVA caused numerous payments to be made and laundered through multiple bank accounts held in the names of shell companies, including certain companies controlled by KARIMOVA. Many of the corrupt transactions were routed into and out of correspondent bank accounts at financial institutions in New York, New York, in order to promote the ongoing bribery scheme and to conceal the proceeds of that scheme.

22.     Beginning in or about the fall of 2001, KARIMOVA and AKHMEDOV hatched a corrupt scheme to obtain a bribe from the American Company. Specifically, in exchange for KARIMOVA's receipt of a 20% ownership interest in Uzdunrobita from the American Company, KARIMOVA used her influence as an Uzbek government official to facilitate Uzdunrobita's receipt of a telecommunications license and other government benefits in Uzbekistan. In or about November 2001, KARIMOVA, AKHMEDOV, Associate A, and representatives of the American Company met in Dubai. At the meeting, KARIMOVA threatened to cause problems for Uzdunrobita if the American Company did not give KARIMOVA a 20% stake in Uzdunrobita at no cost to KARIMOVA. KARIMOVA stated that if KARIMOVA received a stake in Uzdunrobita, then she would obtain a telecommunications license for Uzdunrobita and provide Uzdunrobita with access to official currency exchange in Uzbekistan, which would be a significant benefit to the American Company. Subsequently, the American Company gave a 20% stake in Uzdunrobita to Shell Company A, which executives at the American Company understood was beneficially owned by KARIMOVA, at no cost.

7

23. In or about early 2002, Uzdunrobita announced that Shell Company A was a new shareholder and that AKHMEDOV would be Uzdunrobita's General Director. With KARIMOVA's corrupt assistance, Uzdunrobita obtained a telecommunications license without going through the official auction process and gained access to official currency exchange in Uzbekistan. In or about March 2002, KARIMOVA used her corrupt influence to cause Uzdunrobita's other shareholder, the Uzbek government, to cede 31.4% of its stake in Uzdunrobita to Shell Company A, which was controlled by KARIMOVA, and 10% of its stake to the American Company for free, which made Shell Company A the majority shareholder of Uzdunrobita. As a false cover story to conceal the bribe, Shell Company A agreed to provide purported consulting services and infrastructure to Uzdunrobita as part of the deal. In truth and in fact, Shell Company A provided no such services.

24. In or about 2004, MTS sought to enter the Uzbek telecommunications market by acquiring Uzdunrobita. In connection with the Uzdunrobita transaction, MTS paid a $100 million bribe to KARIMOVA. At the time, AKHMEDOV and certain MTS management knew that Uzdunrobita's majority shareholder, Shell Company B, was also beneficially owned by KARIMOVA. In or about 2003, Shell Company A changed its name and transferred its 51.4% stake in Uzdunrobita to Shell Company B. In or about July 2004, AKHMEDOV caused MTS to acquire a 33% stake in Uzdunrobita from Shell Company B, and a 41% stake in Uzdunrobita from the American Company. As a means of funneling a lucrative bribe payment to KARIMOVA, AKHMEDOV caused MTS to pay Shell Company B approximately six times as much per share as MTS paid to the American Company, even though the shares were identical. Around the same time, MTS and Shell Company B also entered into a Put and Call Option Agreement (the "Option Agreement") pursuant to which MTS had the option to buy, and Shell

8

Company B had the option to sell, Shell Company B's remaining 26% stake in Uzdunrobita for the fixed price of $37.7 million plus interest during the next three years.

25.     On or about July 26, 2004, MTS's Board of Directors retroactively approved the previously executed agreements between MTS and Shell Company B and the American Company in violation of MTS policies that required Board approval before contracts of that amount were signed.  On or about July 29, 2004, MTS transferred approximately $100 million to an escrow account for the benefit of Shell Company B.  On or about August 2, 2004, KARIMOVA, AKHMEDOV, certain MTS management, executives from the American Company, and others attended a deal closing ceremony for MTS's acquisition of Uzdunrobita. KARIMOVA presided over the meeting and signed the meeting minutes.  On or about August 9, 2004, the escrow agent transferred the approximately $100 million bribe from the escrow account to Shell Company B's bank account in Riga, Latvia, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

26.     In or about 2006, KARIMOVA demanded another bribe from MTS through AKHMEDOV.  KARIMOVA told AKHMEDOV, in sum and substance, that she wanted MTS to pay a higher price for Shell Company B's remaining stake in Uzdunrobita than contemplated under the original Option Agreement.  Accordingly, in or about August 2006, KARIMOVA, AKHMEDOV, and certain MTS management negotiated an amendment to the Option Agreement as a mechanism for funneling another bribe payment to KARIMOVA.  On or about August 17, 2006, MTS entered into a new agreement with Shell Company B that amended the terms of the Option Agreement (the "Amended Option Agreement").  The Amended Option Agreement eliminated MTS's call option, extended the time period for Shell Company B's put option, removed the fixed exercise price of $37.7 million plus interest, and instead allowed the

9

value to be determined by an international investment bank. Because Uzdunrobita's value had increased significantly since 2004, in part due to KARIMOVA's influence, AKHMEDOV and certain MTS management understood that the Amended Option Agreement conferred significant corrupt financial benefits to KARIMOVA and did not benefit MTS.

27.    On or about April 2, 2007, at least in part due to KARIMOVA's influence, UzACI granted Uzdunrobita licenses for additional telecommunications frequencies in Uzbekistan.

28.    On or about April 12, 2007, KARIMOVA and AKHMEDOV caused Shell Company B to send notice to MTS of Shell Company B's intention to exercise its option under the Amended Option Agreement, and thereby secure the bribe payment for KARIMOVA. On or about April 27, 2007, MTS and Shell Company B jointly engaged an investment bank to value Shell Company B's remaining share of Uzdunrobita. The bank estimated that 26% of Uzdunrobita was worth approximately $250 million, including the value of licenses for certain additional frequencies that UzACI granted to Uzdunrobita in or about April 2007 as a result of KARIMOVA's influence. On or about June 26, 2007, MTS's Board of Directors approved a $250 million payment to Shell Company B. On or about June 28, 2007, MTS transferred a bribe of approximately $250 million to Shell Company B's bank account in Hong Kong through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

29.    In or about February 2008, KARIMOVA sought additional bribes from MTS and Uzdunrobita. Among other things, KARIMOVA demanded that Uzdunrobita extend various purported loans to KARIMOVA to buy a majority stake in a bank. On or about February 1, 2008, an Uzdunrobita executive emailed certain members of MTS and Uzdunrobita

management, including AKHMEDOV and MTS Executive 1, a proposal to have Uzdunrobita extend loans totaling over $113 million to counterparties controlled by KARIMOVA. When MTS did not agree to extend the purported loans, KARIMOVA demanded millions of dollars in additional bribes from AKHMEDOV, MTS, and Uzdunrobita and threatened to interfere with Uzdunrobita's operations in Uzbekistan if the bribes were not paid.

30.    In or about the summer and fall of 2008, AKHMEDOV and certain MTS management arranged to pay an additional $30 million in bribes to KARIMOVA by arranging for a subsidiary of MTS to enter into a sham contract with Shell Company C, whose beneficial owner—as AKHMEDOV and certain MTS management knew—was KARIMOVA. Under the contract, an MTS subsidiary agreed to pay Shell Company C a total of approximately $30 million in exchange for a subsidiary of Shell Company C's repudiation of its ownership of telecommunications frequencies and the reassignment of those frequencies to Uzdunrobita by UzACI. On or about August 21, 2008, the MTS subsidiary and Shell Company C executed the sham contract. Four days later, UzACI issued an order reallocating the frequencies held by Shell Company C's subsidiary to Uzdunrobita. On or about September 5, 2008, MTS entered into a $30 million loan agreement with its subsidiary to fund the agreement between the MTS subsidiary and Shell Company C. Then, on or about the following dates, MTS or its subsidiary paid the following bribes, totaling approximately $30 million, to KARIMOVA through Shell Company C's bank accounts, which were processed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York:

| Date | Sender | Recipient | Recipient's Bank Location | Amount |
|------|--------|-----------|---------------------------|--------|
| October 21, 2008 | MTS | Shell Company C | Riga, Latvia | $5,000,000 |
| February 7, 2009 | MTS subsidiary | Shell Company C | Hong Kong | $5,000,000 |
| March 5, 2009 | MTS subsidiary | Shell Company C | Hong Kong | $5,000,000 |
| April 28, 2009 | MTS subsidiary | Shell Company C | Hong Kong | $5,000,000 |

| Date | Sender | Recipient | Recipient's Bank Location | Amount |
|---|---|---|---|---|
| June 18, 2009 | MTS subsidiary | Shell Company C | Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Shell Company C | Hong Kong | $5,000,000 |

31.     In or about late 2008 and early 2009, certain MTS management, including AKHMEDOV and MTS Executive 1, discussed the possible acquisition of KOLORIT, an Uzbek advertising company, as a mechanism by which MTS and Uzdunrobita could funnel additional bribes to KARIMOVA.  At the time, KOLORIT was nominally owned, in part, by a company affiliated with Associate C, but in reality was owned and controlled by KARIMOVA.  On or about August 7, 2009, certain MTS management received a memo from MTS's Department of Strategic Planning recommending rejection of the KOLORIT acquisition because the acquisition was not part of MTS's "core business" and the estimate for advertising market development was "not realistic."  Multiple internal MTS and external valuations of KOLORIT were significantly less than the recommended purchase price.  Nevertheless, in or about August 2009, certain MTS management, including MTS Executive 1 and AKHMEDOV, approved MTS's acquisition of KOLORIT in order to facilitate a bribe payment to KARIMOVA.  On or about September 22, 2009, Uzdunrobita funneled the bribe to KARIMOVA by paying the nominal shareholders of KOLORIT approximately 59.375 billion Uzbek som, or approximately $39,636,711, for the shares of KOLORIT.  On or about September 29, 2009, an MTS subsidiary transferred $17,000 to the account of the company affiliated with Associate C in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

32.     In or about 2012, KARIMOVA solicited additional bribes from MTS and Uzdunrobita through AKHMEDOV.  Between in or about March 2012 and May 2012, AKHMEDOV caused Uzdunrobita to pay at least 2.2 billion Uzbek som, or approximately $1.1

million, to purported charities or as sponsorship payments for the benefit of KARIMOVA. AKHMEDOV caused Uzdunrobita to make these corrupt payments in violation of MTS's internal control procedures that required preapproval of such payments.

### The VimpelCom and Unitel Bribes

33.    From in or about 2005 through in or about 2012, AKHMEDOV conspired with others to pay more than $114 million in bribes to KARIMOVA in exchange for KARIMOVA exercising her influence over UzACI to permit VimpelCom and Unitel to operate in Uzbekistan's telecommunications market. AKHMEDOV and others solicited and facilitated bribe payments to KARIMOVA by certain VimpelCom and Unitel management so that VimpelCom and Unitel could continue to obtain necessary UzACI approvals to obtain Uzbek telecommunications business. AKHMEDOV, VimpelCom Executive 1, VimpelCom Executive 2, and others understood that they had to pay KARIMOVA millions of dollars in bribes for VimpelCom and Unitel to continue to do business in Uzbekistan. In addition, AKHMEDOV understood that he had to solicit bribe payments from VimpelCom and Unitel to benefit KARIMOVA to ensure that KARIMOVA continued to allow MTS and Uzdunrobita to do business in Uzbekistan. In furtherance of the scheme, certain co-conspirators used U.S.-based email accounts to communicate with each other and other individuals. AKHMEDOV and KARIMOVA caused numerous corrupt payments to be made and laundered through shell company accounts, with many financial transactions routed into and out of correspondent bank accounts at financial institutions in New York, New York, in order to promote the ongoing bribery scheme and conceal the proceeds of that scheme.

34.    In or about 2005, as part of a plan of expansion into the CIS region, VimpelCom sought to acquire an Uzbek telecommunications company. VimpelCom considered acquiring

two companies: Unitel, the second largest operator in Uzbekistan with approximately 300,000 subscribers; and Buztel, which was a much smaller operator with only approximately 2,500 subscribers. Certain VimpelCom directors and management knew that KARIMOVA held an indirect interest in Buztel and that acquiring Buztel would ensure KARIMOVA's support for VimpelCom's entry into the Uzbek telecommunications market. VimpelCom, through its subsidiaries, purchased Buztel for approximately $60 million on or about January 18, 2006, and Unitel for approximately $200 million, along with the assumption of some debt, on or about February 10, 2006.

35.    In connection with VimpelCom's acquisition of Buztel and Unitel, KARIMOVA solicited bribe payments, through AKHMEDOV, from VimpelCom in exchange for KARIMOVA's support for VimpelCom's entry into the Uzbek market. In an effort to conceal the bribery scheme, KARIMOVA and AKHMEDOV used Shell Company C as the recipient of the VimpelCom bribe payments for KARIMOVA. To mask KARIMOVA's ownership of Shell Company C, KARIMOVA used other individuals to act as nominee owners and shareholders of Shell Company C, although in reality, KARIMOVA retained full ownership and control over Shell Company C. For example, KARIMOVA caused Associate C to hold shares "on trust for" KARIMOVA and to grant an "irrevocable" power of attorney to KARIMOVA for Shell Company C.

36.    In connection with VimpelCom's acquisition of Unitel and Buztel, AKHMEDOV arranged for VimpelCom to enter into a partnership with Shell Company C, which certain VimpelCom management knew was ultimately owned and controlled by KARIMOVA. KARIMOVA, AKHMEDOV, and certain VimpelCom management structured the partnership agreement to conceal the bribe payments to KARIMOVA. More specifically, Shell Company C

obtained an indirect interest of approximately 7% in Unitel for $20 million, and Shell Company C received an option to sell its shares back to Unitel in 2009 for between $57.5 million and $60 million, for a guaranteed net profit of at least $37.5 million. Certain VimpelCom management justified the option agreement—which provided no legitimate financial benefit to VimpelCom and a significant financial benefit to KARIMOVA—by explaining, in board meeting materials, that their "partner," *i.e.*, KARIMOVA, would assist with the "[r]evision of the licensing agreement for the major licenses" and "transfer of frequencies," while acknowledging that the direct transfer of frequencies between legal entities was generally not allowed under Uzbek law.

37.    On or about March 28, 2007, VimpelCom's board unanimously approved the partnership agreement with Shell Company C. On or about June 12, 2007, Shell Company C transferred $20 million from its Latvian bank account to VimpelCom's bank account. In or about September 2009, Shell Company C exercised its guaranteed option to have VimpelCom's subsidiary repurchase Shell Company C's shares, and VimpelCom transferred $57.5 million from its bank account to Shell Company C's bank account in Hong Kong. Both transfers were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

38.    In or about 2007, AKHMEDOV conspired with certain members of VimpelCom's management to pay KARIMOVA, through Shell Company C, an additional $25 million bribe to obtain 3G frequencies from UzACI for Unitel in Uzbekistan. AKHMEDOV negotiated with certain VimpelCom management to arrange for the transfer of the 3G licenses through a sham contract with Shell Company C in order to conceal the corrupt payment to KARIMOVA. In exchange for the $25 million bribe payment, VimpelCom and Unitel obtained an amended license within a matter of days, which permitted Unitel to use the 3G frequencies.

AKHMEDOV served as a go-between for VimpelCom and Unitel management and government regulators, including a high-ranking official at UzACI, to help close the deal. On or about November 7, 2007, a VimpelCom subsidiary transferred $10 million from its Netherlands bank account to Shell Company C's Latvian bank account. On or about November 9, 2007, a VimpelCom subsidiary transferred the remaining $15 million from its Netherlands bank account to Shell Company C's Latvian bank account, fulfilling VimpelCom's bribe payment to KARIMOVA. The corrupt payments from the VimpelCom subsidiary to Shell Company C's bank account in Riga, Latvia, were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

39.    In or about 2008, AKHMEDOV agreed with certain VimpelCom management to pay an additional $2 million bribe to KARIMOVA through a sham consulting agreement with Shell Company C. On or about February 13, 2008, a VimpelCom executive emailed certain VimpelCom management to explain that "the partner [*i.e.*, KARIMOVA], citing the earlier verbal agreements, is returning to the issue [of $2 million] and is asking us to recognize the obligations and make payments." Certain VimpelCom management consulted with AKHMEDOV in order to create fake documents that would contain purported services Shell Company C could perform under a consulting agreement. Additional aspects of the consulting arrangement demonstrated its sham nature. For example, at AKHMEDOV's request, VimpelCom, not Shell Company C, drafted Shell Company C's invoice for the work that Shell Company C purportedly performed, and VimpelCom, not Shell Company C, drafted Shell Company C's service acceptance act. In addition, both documents were backdated to July 18, 2008, and the final executed version of the consulting agreement between VimpelCom and Shell Company C was backdated to June 30, 2008. The final documents, thus, made it falsely appear

that Shell Company C had performed $2 million of purported consulting work for VimpelCom in only 18 days. In fact, Shell Company C did no legitimate work to justify the $2 million bribe payment. On or about August 8, 2008, VimpelCom transferred $2 million from its bank account to Shell Company C's bank account in Riga, Latvia, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

40.    In or about 2011, VimpelCom paid an additional $10 million bribe through AKHEMEDOV to KARIMOVA through "reseller" companies. Because of significant currency conversion restrictions in Uzbekistan and the inability to use Uzbek som (the Uzbek unit of currency) to obtain necessary foreign goods, Unitel frequently entered into non-transparent transactions with purported "reseller" companies to pay foreign vendors in hard currency for the provision of goods in Uzbekistan. Typically, Unitel would contract with a local Uzbek company in Uzbek som, and that Uzbek company's related companies located outside of Uzbekistan would agree to pay an end supplier using the hard currency (usually, U.S. dollars). In or about February and March 2011, AKHMEDOV agreed with VimpelCom Executive 1, VimpelCom Executive 2, and others to take advantage of the murky reseller process to conceal a $10 million bribe to KARIMOVA through various purported reseller transactions. To effectuate the corrupt payment, Unitel entered into contracts with an Uzbek entity for services that were unnecessary and/or at highly inflated prices. These transactions were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel then made payments in Uzbek som to the Uzbek company. Thereafter, an offshore company affiliated with the Uzbek company sent approximately 14 payments totaling $10.5 million to another intermediary, which in turn sent approximately 14 wire payments, each under $1 million and totaling approximately $10,000,023, to Shell Company C's Swiss bank account. These wire transfers were executed

through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. Shell Company C performed no legitimate services to justify the $10 million in payments, which, instead, were simply bribes for KARIMOVA.

41.     In or about 2011, AKHMEDOV agreed with VimpelCom Executive 1, VimpelCom Executive 2, and others to funnel an additional $30 million bribe payment to KARIMOVA through Shell Company C. While the purported purpose of the payment was to acquire 4G mobile communication frequencies for Unitel, the real purpose of the payment was to enable Unitel to continue to operate in the Uzbek telecommunications market without any interference by KARIMOVA. AKHMEDOV, VimpelCom Executive 1, VimpelCom Executive 2, and others modeled the 2011 4G agreement on VimpelCom's 3G agreement in 2007, except that the 2011 4G agreement purportedly was for consulting services and full payment was not contingent on obtaining the 4G frequencies. At the time, Unitel had no need for 4G frequencies because Unitel lacked the ability to employ 4G frequencies in Uzbekistan. Certain VimpelCom management knew that the 4G consulting agreement was a sham and that Shell Company C would not provide any actual services in return for the $30 million payment. On or about September 21, 2011, a VimpelCom subsidiary transferred $20 million as an advance payment under the 4G consulting agreement to Shell Company C's Swiss bank account. On or about October 18, 2011, UzACI issued a decision amending Unitel's license to allow it to use 4G frequencies. The following day, on or about October 19, 2011, the VimpelCom subsidiary sent the final $10 million payment to Shell Company C's Swiss bank account. The corrupt payments from the VimpelCom subsidiary to Shell Company C's Swiss bank account were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. Shell Company C never provided any legitimate consulting services to Unitel

to justify the $30 million in payments. In fact, Shell Company C's consulting reports and presentations that were prepared under the consulting agreement were not needed by VimpelCom or Unitel and were largely plagiarized from Wikipedia entries, other internet sources, and internal VimpelCom documents.

42.     In or about 2012, AKHMEDOV agreed with VimpelCom Executive 1, VimpelCom Executive 2, and others to make another $10 million in bribe payments to KARIMOVA via Shell Company C through purported transactions with "reseller" companies. As in 2011, AKHMEDOV, VimpelCom Executive 1, and VimpelCom Executive 2, knew that the true purpose of these transactions was to funnel $10 million in corrupt bribes to Shell Company C. Between in or about February and May 2012, Unitel entered into contracts, this time with multiple Uzbek entities for services that were unnecessary and/or at highly inflated prices. These transactions again were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel made payments in Uzbek som to those Uzbek companies. AKHMEDOV then arranged for approximately 13 bribe payments, each under $1 million and totaling approximately $10 million, to be funneled through the "reseller" companies to Shell Company C's Swiss bank account. These wire transfers were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. As in 2011, VimpelCom and Unitel, through VimpelCom Executive 1, VimpelCom Executive 2, and others, used these reseller transactions to funnel and conceal the $10 million in bribes to KARIMOVA through Shell Company C. Shell Company C performed no legitimate services to justify the $10 million in payments.

### *The Telia and Coscom Bribes*

43.    From in or about 2007 through in or about 2010, AKHMEDOV conspired with others to pay approximately $331.2 million in bribes to KARIMOVA in exchange for KARIMOVA exercising her influence over UzACI to allow Telia to enter and expand Coscom's share of the Uzbek telecommunications market.  AKHMEDOV solicited and facilitated bribe payments by certain Telia and Coscom management so that Telia and Coscom could continue to obtain necessary UzACI approvals and be allowed to obtain and retain Uzbek telecommunications business.  AKHMEDOV, Telia Executive 1, and others understood that they had to regularly pay KARIMOVA millions of dollars in bribes in order to continue to do business in Uzbekistan.  In addition, AKHMEDOV understood that he had to regularly solicit bribe payments from Telia and Coscom to benefit KARIMOVA to ensure that KARIMOVA continued to allow MTS and Uzdunrobita to do business in Uzbekistan.  In furtherance of the bribery scheme, certain co-conspirators used U.S.-based email accounts to communicate with each other and other individuals to further the scheme.  AKHMEDOV and KARIMOVA caused numerous corrupt payments to be made and laundered through multiple shell company accounts, with many financial transactions routed into and out of correspondent bank accounts at financial institutions in New York, New York, in order to promote the ongoing bribery scheme and conceal the proceeds of that scheme.

44.    In or about 2006, Telia sought to acquire a telecommunications company operating in Uzbekistan.  Telia Executive 1 and certain other Telia management decided to acquire a U.S.-based telecommunications company that was the parent company of Coscom, which was already operating in Uzbekistan.  After several months of negotiations facilitated by AKHMEDOV, on or about July 3, 2007, Telia's board of directors agreed to acquire Coscom

20

through a wholly owned subsidiary of Telia for approximately $410 million plus $30 million for the acquisition of additional assets in Uzbekistan.

45.    On or about July 4, 2007, Telia Executive 1, signed a partnership agreement on behalf of Sonera Hungary Holding B.V. (later renamed TeliaSonera UTA Holding B.V.), a Telia subsidiary, with "the Uzbek Partner," who was defined in the agreement as AKHMEDOV "or his nominee." Telia Executive 1 and other Telia management understood that AKHMEDOV was acting on behalf of KARIMOVA. The partnership agreement set forth basic terms that later would be formalized as part of a Shareholders Agreement in December 2007, including that the Uzbek Partner would receive a net balance of $30 million and shares of Telia Uzbek, the 99.97% owner of Coscom, with the option to sell the shares back to Telia UTA at a substantial profit for KARIMOVA. On or about July 16, 2007, Telia completed its acquisition of Coscom through payments and transfer of ownership.

46.    In exchange for KARIMOVA and AKHMEDOV's support for Telia's entry into the Uzbek telecommunications market through Coscom, KARIMOVA, through AKHMEDOV, solicited bribe payments from Telia. In or about August 2007 Telia Executive 1 and other Telia management ordered a Coscom executive to make a corrupt, cash payment of approximately $2 million directly to AKHMEDOV in the lobby of a hotel in Tashkent, Uzbekistan.

47.    In or about late 2007, Telia arranged, through AKHMEDOV, the $30 million bribe to KARIMOVA. On or about November 21, 2007, AKHMEDOV emailed Telia Executive 1 and other Telia management with a proposed payment structure for a bribe based on the mechanism previously employed by AKHMEDOV on behalf of MTS and VimpelCom. Specifically, AKHMEDOV arranged a series of sham transactions involving Telia UTA and Shell Company C, which resulted in KARIMOVA's receipt of the $30 million bribe payment, an

indirect 26% ownership interest in Coscom at no cost, and a put option to obtain a much larger payment at a later date at no cost. That option was a significant benefit to KARIMOVA, but provided Telia with no legitimate financial benefit.

48.     In or about 2008, Telia paid an additional $9.2 million in bribes to KARIMOVA through AKHMEDOV. After AKHMEDOV and Telia management finalized the agreement with Shell Company C, certain Telia management traveled to Tashkent to meet with certain Coscom management and Uzbek government officials between January 6 and 11, 2008. KARIMOVA met with certain Telia management during their trip to Tashkent. In the summer of 2008, AKHMEDOV negotiated the bribe for KARIMOVA with certain Telia management, including Telia Executive 1, which ultimately resulted in a $9.2 million corrupt payment to KARIMOVA through Shell Company C. The payment purportedly was for Coscom to acquire a number series of one million telephone numbers and a network code. On or about September 15, 2008, certain Telia management, including Telia Executive 1, received and approved a memo seeking authorization to execute the agreement with Shell Company C. On or about September 16, 2008, Telia Uzbek transferred $9.2 million to Shell Company C's bank account in Riga, Latvia, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

49.     The December 2007 Shareholders Agreement granted Shell Company C the right to sell back shares of Coscom to Telia UTA after December 31, 2009. On or about January 18, 2010, certain Telia management, including Telia Executive 1, drafted and sent a memorandum to the Telia board of directors seeking approval to purchase 20% of Shell Company C's indirect 26% ownership interest for a price not to exceed $220 million. On or about January 25, 2010, Telia UTA, through certain Telia management, entered into an agreement with Shell Company

C, pursuant to which Shell Company C agreed to sell 20% of its indirect 26% ownership interest in Coscom for $220 million. In addition, on or about that same day, Telia UTA, Telia Uzbek, and Shell Company C entered into an Amendment Agreement to the Shareholders Agreement in which Shell Company C retained the right to sell its remaining 6% ownership interest in Coscom after February 15, 2013, for a floor price of $50 million. Both agreements were signed by certain Telia management and by Associate C, on behalf of Shell Company C. On or about February 2, 2010, Telia authorized a payment of $220 million to Shell Company C's bank account in Hong Kong, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. Telia management authorized the $220 million bribe payment to KARIMOVA through Shell Company C in order to continue its telecom business in Uzbekistan.

50.    In or about January 2010, AKHMEDOV solicited Telia for another bribe payment for KARIMOVA. Over the next few months, AKHMEDOV had multiple discussions with members of Coscom's management team about obtaining 4G frequencies in exchange for bribes to KARIMOVA. In or about April 2010, Telia agreed to make a $15 million corrupt payment to benefit KARIMOVA in order to obtain certain 4G frequencies. The corrupt payment involved multiple transactions in which Telia agreed to pay $15 million to a third-party vendor to assume a debt owed to that vendor by a Swiss company that was beneficially owned by KARIMOVA. To effectuate the corrupt payment, certain Telia management, including Telia Executive 1, agreed to execute four separate and parallel agreements, which they understood would ultimately benefit KARIMOVA. Certain Telia management, including Telia Executive 1, handled and approved the transactions based on discussions and understandings reached with AKHMEDOV, who they understood to be acting on behalf of KARIMOVA. On or about June 11, 2010, UzACI issued a decision granting Coscom the right to use certain 4G frequencies that had previously

been awarded to, and subsequently waived by, Uzdunrobita. On or about the same day, a member of Telia management, copying Telia Executive 1, sent AKHMEDOV confirmation of the payment. On or about June 15, 2010, Telia Uzbek transferred $15 million to the third-party vendor to satisfy its obligations under the agreements. The $15 million payment was made through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

51.    In or about September 2010, AKHMEDOV began negotiations with certain Telia management concerning an additional bribe for KARIMOVA through a proposed services agreement between Shell Company C and Telia Uzbek. On or about October 17, 2010, certain Telia management, including Telia Executive 1, drafted a proposal for the Telia board of directors to review, which explained that Shell Company C had offered Coscom additional 4G frequencies and the opportunity to lease fiber optic network from Uzbektelecom. The cost of the proposed deal was $75 million, with $20 million payable to Uzbektelecom in return for a 20-year lease and $55 million payable to Shell Company C. Telia's board approved the transaction during a board meeting on or about October 22, 2010. On or about November 1, 2010, Telia Uzbek entered into an agreement with Shell Company C, in which Shell Company C agreed to obtain permission from UzACI for Coscom to use certain 4G frequencies and to execute a long-term lease agreement with Uzbektelecom. In exchange, Telia Uzbek agreed to pay $55 million to Shell Company C. The agreement was signed by Associate C on behalf of Shell Company C. On or about November 26, 2010, UzACI granted Coscom the right to use certain 4G frequencies, which had previously been held and waived by Uzdunrobita. After the 4G frequencies were granted to Coscom, certain Telia management, including Telia Executive 1, sought to fabricate a justification for the $55 million bribe payment to Shell Company C, because, unlike with the 3G

frequency transaction, Shell Company C never held the relevant frequencies and, therefore, did not repudiate them. On or about December 16, 2010, Telia transferred $55 million to Shell Company C's Swiss bank account, which was routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

## STATUTORY ALLEGATIONS

52.     Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

53.     From at least in or about 2001 through in or about 2012, in the Southern District of New York and elsewhere, BEKHZOD AKHMEDOV, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate the FCPA, Title 15, United States Code, Sections 78dd-1 and 78dd-3.

54.     It was a part and object of the conspiracy that BEKHZOD AKHMEDOV, the defendant, and others known and unknown, being an issuer, and an officer, director, employee, and agent of an issuer, would and did willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing any act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do any act in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign

government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist MTS, VimpelCom, and Telia in obtaining and retaining business for and with, and directing business to, MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and any person, in violation of Title 15, United States Code, Section 78dd-1.

55.     It was further a part and object of the conspiracy that BEKHZOD AKHMEDOV, the defendant, and others known and unknown, while in the territory of the United States, through and together with their officers, directors, employees, or agents, did willfully and corruptly commit acts in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to any person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official and to any person, for purposes of: (i) influencing any act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do any act in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist Coscom and its employees and agents in obtaining and retaining business for and with, and directing business to MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and any person, in violation of Title 15, United States Code, Section 78dd-3.

**<u>Overt Acts</u>**

56.     In furtherance of the conspiracy and to effect the illegal objects thereof, the

following overt acts, among others, were committed in the Southern District of New York and elsewhere:

      a.     On or about August 9, 2004, an escrow agent transferred approximately $100 million from an escrow account, which had been funded by MTS, to Shell Company B's bank account in Riga, Latvia, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

      b.     On or about June 28, 2007, MTS transferred approximately $250 million to Shell Company B's bank account in Hong Kong, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

      c.     On or about July 4, 2007, Telia Executive 1 entered into a partnership agreement with "the Uzbek Partner," which AKHMEDOV signed on behalf of KARIMOVA.

      d.     On or about July 16, 2007, Telia paid $277 million to a U.S.-based telecommunications company that was the parent company of Coscom in Uzbekistan to help facilitate the partnership with "the Uzbek Partner," *i.e.*, KARIMOVA.  The payments were made to the company's U.S. bank account.

      e.     On or around July 17, 2007, a Telia employee spoke to an agent of a U.S.-based advisory firm about the agent's $3 million fee for facilitating the partnership with KARIMOVA.  While in the territory of the United States, the Telia employee sent an email to that agent requesting that the agent's original invoices for the work facilitating the partnership be mailed by the agent to the Telia employee.

      f.     In or about August 2007, a Coscom executive paid a bribe of approximately $2 million in cash to AKHMEDOV in the lobby of a hotel in Tashkent, Uzbekistan, for the benefit KARIMOVA.

g.    On or about the following dates, the following companies transferred funds to Shell Company C's bank account in Riga, Latvia, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York:

| Date | Company | Sending Bank Country | Amount |
|---|---|---|---|
| November 7, 2007 | VimpelCom subsidiary | Netherlands | $10 million |
| November 9, 2007 | VimpelCom subsidiary | Netherlands | $15 million |
| December 27, 2007 | Telia | Sweden | $80 million |
| August 8, 2008 | VimpelCom | Russia | $2 million |
| September 16, 2008 | Telia Uzbek | Netherlands | $9.2 million |
| October 21, 2008 | MTS | Russia | $5 million |

h.    On or about the following dates, the following companies transferred funds to Shell Company C's bank account in Hong Kong through transactions into and out of correspondent bank accounts at financial institutions in New York, New York:

| Date | Company | Sending Bank Country | Amount |
|---|---|---|---|
| February 7, 2009 | An MTS subsidiary | France | $5 million |
| March 5, 2009 | An MTS subsidiary | France | $5 million |
| April 28, 2009 | An MTS subsidiary | France | $5 million |
| June 18, 2009 | An MTS subsidiary | France | $5 million |
| July 14, 2009 | MTS | Russia | $5 million |
| September 23, 2009 | VimpelCom | Russia | $57.5 million |

i.    On or about September 22, 2009, Uzdunrobita paid the three shareholders of KOLORIT a total of approximately 59.375 billion Uzbek som, which was worth approximately $39,619,711 at the time.

j.    On or about September 29, 2009, an MTS subsidiary transferred approximately $17,000 to the account of a purported shareholder of KOLORIT in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

k.      On or about February 2, 2010, Telia authorized a payment of approximately $220 million to Shell Company C's bank account in Hong Kong, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

l.      On or about June 15, 2010, Telia Uzbek transferred approximately $15 million to a third-party vendor to satisfy certain obligations and agreements with AKHMEDOV and KARIMOVA, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

m.      On or about December 16, 2010, Telia transferred approximately $55 million to Shell Company C's Swiss bank account through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

n.      In or around about March 2011, AKHMEDOV and others caused reseller and intermediary companies to transfer approximately $10.5 million to a Cyprus-based intermediary, which in turn, on or about the following dates, sent approximately 14 wire payments from a Cyprus-based bank account, totaling approximately $10 million to Shell Company C's Swiss bank account through transactions into and out of correspondent bank accounts at financial institutions in New York, New York:

| Date | Amount |
|---|---|
| March 3, 2011 | $780,000 |
| March 4, 2011 | $889,644 |
| March 4, 2011 | $740,000 |
| March 8, 2011 | $840,000 |
| March 8, 2011 | $590,000 |
| March 9, 2011 | $910,320 |
| March 11, 2011 | $980,000 |
| March 11, 2011 | $940,000 |
| March 14, 2011 | $740,000 |
| March 14, 2011 | $284,997 |
| March 17, 2011 | $854,994 |

| Date | Amount |
|---|---|
| March 21, 2011 | $980,000 |
| March 21, 2011 | $444,988 |
| March 24, 2011 | $25,080 |

o.      On or about September 21, 2011, a VimpelCom subsidiary transferred approximately $20 million to Shell Company C's Swiss bank account through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

p.      On or about October 19, 2011, a VimpelCom subsidiary transferred approximately $10 million to Shell Company C's Swiss bank account, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

q.      In or about April and May 2012, AKHMEDOV and others caused reseller and intermediary companies to transfer approximately $10.5 million to a Cyprus-based intermediary, which in turn, on or about the following dates, sent approximately 13 wire payments from a Cyprus-based bank account, totaling approximately $10 million, to Shell Company C's Swiss bank account through transactions into and out of correspondent bank accounts at financial institutions in New York, New York:

| Date | Amount |
|---|---|
| April 13, 2012 | $854,985 |
| April 20, 2012 | $854,985 |
| April 24, 2012 | $892,702 |
| April 24, 2012 | $854,985 |
| April 24, 2012 | $854,985 |
| April 24, 2012 | $799,027 |
| April 25, 2012 | $892,702 |
| April 25, 2012 | $854,985 |
| April 25, 2012 | $854,985 |
| April 25, 2012 | $854,985 |
| April 26, 2012 | $854,985 |
| May 4, 2012 | $575,689 |
| May 17, 2012 | $9,000 |

r.    On or about April 24, 2012, AKHMEDOV caused Uzdunrobita to send a payment order to an entity related to KARIMOVA for the equivalent of 100 million Uzbek som as a purported advance payment for sponsorship aid.

(Title 18, United States Code, Section 371.)

### COUNTS TWO AND THREE
(Violations of the FCPA)

The Grand Jury further charges:

57.    Paragraphs 1 through 51 and 56 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

58.    On or about the dates set forth below, in the Southern District of New York and elsewhere, BEKHZOD AKHMEDOV, the defendant, being an officer, employee and agent of an issuer, willfully and corruptly made use of and caused to be used the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to any person, while knowing that all, or a portion of such money and things of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing any act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do any act in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and instrumentality thereof, to affect and influence acts and decisions of such government and instrumentality, in order to assist MTS, VimpelCom, Telia, and others known and unknown, in obtaining and retaining business for and with, and directing business to, MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom and any person, to wit, AKHMEDOV caused the following

31

wire transfers to be made from bank accounts associated with a VimpelCom subsidiary to Shell

Company C's Swiss bank accounts, to, from, and through correspondent bank accounts located

in New York, New York, and aided and abetted the same:

| Count | Date | Amount |
|-------|------|--------|
| 2 | September 21, 2011 | $20 million |
| 3 | October 19, 2011 | $10 million |

(Title 15, United States Code, Section 78dd-1; Title 18, United States Code, Section 2.)

## COUNT FOUR
(Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

59.     Paragraphs 1 through 51 and 56 of this Indictment are realleged and incorporated

by reference as if fully set forth herein.

60.     From in or about 2001 through in or about 2012, in the Southern District of New

York and elsewhere, GULNARA KARIMOVA and BEKHZOD AKHMEDOV, the defendants,

and others known and unknown, willfully and knowingly did combine, conspire, confederate,

and agree together and with each other to commit money laundering, in violation of Title 18,

United States Code, Sections 1956(a)(2)(A) and 1956(a)(2)(B)(i).

61.     It was a part and object of the conspiracy that GULNARA KARIMOVA and

BEKHZOD AKHMEDOV, the defendants, and others known and unknown, would and did

knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer a

monetary instrument and funds from a place in the United States to and through a place outside

the United States, and to a place in the United States from and through a place outside the United

States, with the intent to promote the carrying on of specified unlawful activity, to wit, a scheme

to bribe KARIMOVA on behalf of MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and

others, in violation of: (a) the FCPA, Title 15, United States Code, Sections 78dd-1 and 78dd-3;

32

(b) the laws of the Russian Federation prohibiting bribery of a foreign official; (c) the laws of the Republic of Uzbekistan prohibiting bribery of a government official; (d) the laws of the Kingdom of Sweden prohibiting bribery of a foreign official; and (e) the laws of the Kingdom of the Netherlands prohibiting bribery of a foreign official; all to influence KARIMOVA, in her position as a government official of the Republic of Uzbekistan, to provide business benefits and award telecommunications licenses to MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and others.

62.    It was further a part and object of the conspiracy that GULNARA KARIMOVA and BEKHZOD AKHMEDOV, the defendants, and others known and unknown, would and did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, proceeds of the scheme to bribe KARIMOVA on behalf of MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and others, in violation of (a) the FCPA, Title 15, United States Code, Sections 78dd-1 and 78dd-3; (b) the laws of the Russian Federation prohibiting bribery of a foreign official; (c) the laws of the Republic of Uzbekistan prohibiting bribery of a government official; (d) the laws of the Kingdom of Sweden prohibiting bribery of a foreign official; and (e) the laws of the Kingdom of the Netherlands prohibiting bribery of a foreign official; all to influence KARIMOVA, in her position as a government official of the

Republic of Uzbekistan, to provide business benefits and award telecommunications licenses to

MTS, Uzdunrobita, VimpelCom, Unitel, Telia, Coscom, and others.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

63.     As a result of committing one or more of the FCPA offenses alleged in Counts

One through Three of this Indictment, BEKHZOD AKHMEDOV, the defendant, shall forfeit to

the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28

United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is

derived from proceeds traceable to the commission of said offenses, including but not limited to

a sum of money in United States currency representing the amount of proceeds traceable to the

commission of said offenses.

64.     As a result of committing the money laundering offense alleged in Count Four of

this Indictment, GULNARA KARIMOVA and BEKHZOD AKHMEDOV, the defendants, shall

forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in said offense, and any property traceable to such property.

Substitute Assets Provision

65.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third person;

       c.     has been placed beyond the jurisdiction of the Court;

       d.     has been substantially diminished in value; or

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be subdivided

            without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

        (Title 18, United States Code, Sections 981 & 982;
           Title 21, United States Code, Section 853; and
            Title 28, United States Code, Section 2461.)

_____

Foreperson

 

_____

GEOFFREY S. BERMAN
United States Attorney

_____

ROBERT A. ZINK
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### GULNARA KARIMOVA and
### BEKHZOD AKHMEDOV,

### Defendants.

## INDICTMENT

19 Cr. _____ (   )

(15 U.S.C. §§ 78dd-1, 78dd-3;
18 U.S.C. §§ 371, 1956 and 2.)

GEOFFREY S. BERMAN
United States Attorney

ROBERT A. ZINK
Acting Chief, Fraud Section, Criminal Division
U.S. Department of Justice

Foreperson: _Tracy M_____

March 7, 2019
Filed Indictment. Case assigned to Judge Wood.
U.S.M.J., Debra Freeman

36